# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

MICHAEL WILSON,

                **Plaintiff,**

     **v.**                              **1:16-cv-812-WSD**

**MARINEMAX EAST, INC., and
SEA RAY BOATS, INC., A
DIVISION OF BRUNSWICK
CORPORATION,**

                **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendant Sea Ray Boats, Inc., a Division of Brunswick Corporation's ("Sea Ray") Motion for Summary Judgment [38], Defendant MarineMax East, Inc.'s ("MarineMax") Motion for Summary Judgment [40], Defendants' Motion to Exclude Opinion Testimony of Robert Newman [39], and Plaintiff Michael Wilson's ("Plaintiff") Motion to Strike the Declaration of McLamb [53].

## I.    BACKGROUND

### A.    <u>Facts</u>

Plaintiff purchased a SeaRay 330 DA boat. That boat immediately had Kohler generator issues and engine issues and eventually caught fire on the dock.

([46] Wilson Dep. at 9:30, 11:12-23). Sea Ray offered Plaintiff a substitute Sea Ray 350 DA boat in exchange for the 330 DA—boat for boat. ([46] Wilson Dep. 14:15, 15:13).

1. Plaintiff's Purchase of a 2014 Sea Ray 350 DA Boat

On or about February 19, 2014, Plaintiff entered into a Purchase Agreement (the "Purchase Agreement") with Defendant MarineMax for the purchase of a 2014 Sea Ray 350 DA boat (the "Boat"). ([46] Wilson Dep. at 22:14-23; [46.6]). The Boat came with a Limited Warranty issued by Sea Ray (the "Limited Warranty"). ([46] Wilson Dep. at 28:20-25, 29:1-7; [47.3]). The Boat also came with separate warranties for the Kohler generator and the Mercruiser engines from their respective manufacturers. ([46] Wilson Dep. at 100:21-101:7; [42] Dinan Dep. at 46:10-13; [49.10]).

The Purchase Agreement provides that warranties are generally excluded by MarineMax "*unless* Seller enters into a service contract in connection with this sale or within 90 days of the sale. . . If seller . . . enters into a service contract in connection with this sale or within 90 days of sale, then any implied warranties shall be limited to the duration of Seller's written warranty or service contract." ([46] Wilson Dep. at 22:21-23:1; [46.6] at 2). At the time of Plaintiff's acquisition of the Boat, he executed the "Passport Premiere Registration Page" providing him

with a six year extended warranty from Brunswick Product Protection Corporation (the "Extended Warranty"). ([46] Wilson Dep. at 23:20-24:6; [46.8]). The Passport Premier Registration Page identifies MarineMax East, Inc., as the "Issuing Dealer" and Mike Crisell, MarineMax's business manager, as the "Selling Individual." ([46.8]). The parties dispute the nature of the Extended Warranty. Plaintiff contends that he entered into a service contract with Marine Max East, Inc. which provided an extended service agreement on the Boat. ([46] Wilson Dep. at 24:3-6; [46.8]). Defendants assert that Plaintiff separately executed the Extended Warranty, that the Extended Warranty is distinct from service contracts MarineMax offers to customers, and that Plaintiff did not purchase or obtain any service contracts from MarineMax for the Boat. ([64.2] McLamb Decl. at ¶¶ 9-10).

2. Plaintiff's Use of the Boat

Plaintiff took delivery of the Boat in February 2014 and used the Boat on a regular basis at least through August 2015. ([46] Wilson Dep. at 49:24-50:4). Plaintiff admits to using the Boat year round, at some points daily. ([46] Wilson Dep. at 49:24-50:4). He also acknowledged both of his sons were permitted to use the Boat without him present. ([46] Wilson Dep. at 47:25-48:7). Plaintiff testified normal use for him was "out there several times a week, weather permitting."

([46] Wilson Dep. at 63:21-24). Plaintiff's use included overnight trips on the Boat. ([46] Wilson Dep. at 64:10-15).

The Electronic Control Module ("ECM") for the Boat records the number of hours of engine use. During the manufacturing process, Sea Ray water tested the Boat and placed 2 hours on the Boat's engines. ([64.1] Raustad Decl. at ¶ 5). Defendants' expert, Michael Griffin, inspected the Boat on May 22, 2016 and recorded 509.2 engine hours on the Boat. ([45] Griffin Dep. at 6:7-13). Mr. Griffin conducted a follow-up inspection on January 30, 2017, and recorded that the Boat engines had 581.6 hours. ([45] Griffin Dep. at 6:7-13).

Plaintiff disputes the accuracy of the engine hours reported by the ECM. Plaintiff testified that the "hours meters do not work correctly." ([46] Wilson Dep. at 97:25, 98:4-19). Plaintiff explained that there are two keys you have to turn on to operate the engine side of the boat and "[i]f you leave those keys on and the boat is not running, your hours meter continues to click." ([46] Wilson Dep. at 98:1-6). Plaintiff also notes that the ECM does not tell you if the boat is in gear. ([45] Griffin Dep. at 60:20-24). Plaintiff estimates that the Boat was operated for approximately 130 hours in 2014 and 130 hours in 2015. ([46] Wilson Dep. at 97:14-17).

3.     Problems with the Boat

The history of the Boat is well documented with work orders and email correspondence between Plaintiff and MarineMax and largely undisputed. Upon delivery, Plaintiff requested the Boat stay near the MarineMax service facility at Lake Lanier, where he could use it and ensure there were no "bugs" for 30 days. ([46] Wilson Dep. at 20:11-18). Plaintiff used the Boat recreationally at Lake Lanier for several weeks. ([46] Wilson Dep. at 33:21-25, 34:1-4). In March of 2014, MarineMax delivered the Boat to Plaintiff at Lake Allatoona. ([46] Wilson Dep. at 29:16-24, [47.4]).

Throughout its use, Plaintiff experienced a number of issues with the Boat, most notably with the engines and on-board generator. Plaintiff maintains that generator issues hindered use of the Boat. While the Boat can operate without the generator being functional, electrical items such as air conditioning and radio will not function. ([46] Wilson Dep. at 46:10-13); [54.3] at ¶ 7; [55.1] at ¶ 7). Plaintiff also experienced engine codes on numerous occasions. Plaintiff maintains that the boat operates in reduced functionality when the engine codes are being shown. ([46] Wilson Dep. at 42:25-43-2). Plaintiff also asserts that the engines were "babied" as a result of frequent error codes and performance issues and that engine

RPM historical data supports that assertion. ([46] Wilson Dep. at 35:25, 46:10-13; [43] P. Wilson Dep. at 21:20; [45] Griffin Dep. at 13:14-15, 53-54).

Plaintiff first experienced issues with the generator on March 2, 2014. ([46] Wilson Dep. at 34:5-25). That same date, MarineMax sent two technicians to Plaintiff's Boat and repaired the generator. ([46] Wilson Dep. at 35:10-16, 37:25, 38:1-3). MarineMax's Service Team Leader, Bob Dinan, one of the two technicians that fixed the generator stated the issue arose from a failure to winterize thereby causing freeze damage. ([42] Dinan Dep. at 30:1-12).

Unbeknownst to anyone at the time, the Boat suffered from a design defect affecting the generator. On November 17, 2015, more than 20 months after the initial repair of the generator, Sea Ray issued a Service Bulletin for Sea Ray 350DA model boats with regards to the Generator Water Pickup Update. ([64.1] Raustad Decl. at ¶ 12). Sea Ray determined the Groco hi-speed water pickup part had a v-notch that is too large and can cause water to flood the engine cylinder area of the generator at higher speeds if the seacock is open and the generator is not running. ([64.1] Raustad Decl. at ¶ 9). This results in hydrolock. An engine that is hydrolocked has water in the combustion chambers and the water cannot compress like air does, so it "would be almost seized." ([42] Dinan Dep. at 45:17-21).

Also in March of 2014, Plaintiff reported the windlass anchor (the "Windlass") was inoperable. ([48.1]). MarineMax's work order for this repair indicated the Windlass's breaker had been tripped. ([48.1]). The work order further stated the power breakers on the dock pedestal were turned off and Plaintiff was advised that the Windlass can pull a large amount of amperage and it is important to keep batteries fully charged. ([48.1]).

A May 20, 2014, work order (#79758) documents a number of problems experienced by Plaintiff. Plaintiff reported that the "Windlass motor has come loose off of it's [sic] mounting bracket" and the technician stated that the "windlass motor mounting bolts sheared off at the base of the upper unit." ([42.1] at 14). Plaintiff also reported engine alarm codes on both starboard and port engines being experienced. ([42.1] at 15-17). Defendants, along with the engine manufacturer, worked to fix the engines over the next few weeks.

On June 4, 2014, Plaintiff sent an email to MarineMax and Sea Ray employees expressing his dissatisfaction with the Boat. ([46] Wilson Dep. at 39:2-25, 39:32-40:25; [48.3]). The email included the subject line "I am ready to return this boat and be made while [sic]" and requested "an address for legal service because this entire experience sucks!!" ([48.3]). Plaintiff confirmed the engines worked, but he was receiving error codes. ([46] Wilson Dep. at 42:23-25,

43:1-2).  Thereafter, Plaintiff met Jim Helmick of Mercury regarding the engines.  ([46] Wilson Dep. at 41:23-25, 42:1-2).  The repair records reveal Mercury worked directly with Plaintiff to complete the work and Mercury approved the claim under its engine warranty.  ([46] Wilson Dep. at 41:23-25, 42:1-2; [42] Dinan Dep. 42:9-16).

After MarineMax technicians failed to completely resolve the engine issues after repair attempts and sea trials, a Mercury technical representative examined the Boat and seatrialed it again.  ([42.1] at 16).  The work order states "shift handle adapt procedure was performed on boat to see if this might resolve surging issue, but was ineffective.  Sea trailed [sic] boat with Jim from Mercury for approx 1 hour to ensure that no faults were occurring and to examine surging issue.  Was informed Mercury engineering that this is a known issue and that a programming solution is in the works, but does not yet exist."  ([42.1] at 16).

On June 11, 2014, Plaintiff emailed that the Boat had experienced another port engine fault after driving the boat for approximately 30 minutes.  Plaintiff stated that "[s]till have not had the chance to use my new [sic] without having a problem since it was delivered to Allatoona?!"  ([48.3]).  On June 11, 2014, Plaintiff emailed stating "Enough is enough. I have been more than patient.  I have not been able to use the boat once without a problem since it was delivered to

Allatoona.  Now I have lost all confidence in Sea Ray.  It is to the point where I won't take anyone out with me because it is embarrassing.  Please call me ASAP to discuss options."  ([46] Wilson Dep. at 41:14-22).  By July 8, 2014, the engine problems appeared to be resolved as Plaintiff reported to MarineMax that the "boat seems to finally be settling in, we enjoyed it over the 4th with no issues."  ([48.6] at 2).

During the June 2014 period in which the engine issues were being addressed, Plaintiff experienced another generator shut down.  MarineMax found the impeller needed replacement.  ([46] Wilson Dep. at 45:10-18).  Defendants contend the impeller is a wearable part that only lasts for about a year.  ([42] Dinan Dep. at 31:12-25).  The work order for the impeller replacement noted that the generator had been used for 234.1 hours.  ([48.5]).  When replacing the impeller, MarineMax also found that there were multiple coolant leaks and evidence of an oil leak on the generator.  ([48.5]; [46] Wilson Dep. at 45:17, 51:10-14).  On July 7, 2014, Dinan emailed Plaintiff to advise the generator coolant leak was a warranty repair and Kohler had been contacted.  ([48.6]).

Just days after reporting use of the Boat "over the 4th with no issues," Plaintiff again experienced engine and generator trouble.  A July 10, 2014, MarineMax Work Order (#80101) states "there is a port engine alarm. Code 61"

and the "generator is faulting and will not start." ([48.7] at 2). The technician

determined that the port engine needed a new DTS shift actuator and reported that

the generator engine was "hydro locked" as evidenced by water running out of the

forward cylinder when the spark plugs were pulled. ([48.7] at 2; [46] Wilson Dep.

at 54:11-17). At this time, the generator showed 290 hours of use. (Id.).

Later that same month, Plaintiff once again experienced engine and

generator issues. Plaintiff reported on July 27, 2014, that the port engine was

"giving [him] the code #61" and the generator is faulting out and now will not

start." ([48.9] at 2; [46] Wilson Dep. at 56:10). Dinan reported back to Plaintiff

on July 29, 2014, stating there is "another actuator failure on the port engine" and

"regarding the generator, [l]ooks like it will need an engine repair." ([48.11] at 1;

[46] Wilson Dep. at 58:23, 59:3-5). MarineMax replaced the generator under the

Kohler warranty. ([42] Dinan Dep. at 30:3-7). By July 31, 2014, the generator had

been replaced at no cost to Plaintiff. ([46] Wilson Dep. at 61:1-5, 11-14; [42]

Dinan Dep. at 30:5-7; [48.12]). Plaintiff testified that the generator worked for "a

short period of time" after that. ([46] Wilson Dep. at 60:3).

From August 2014 to March 2015, there are no work orders or

correspondence evidencing any issues with the Boat. ([46] Wilson Dep. at

62:11-20). During the 8-month time period between August of 2014 through

March of 2015, Plaintiff used the boat several times per week, weather permitting. ([46] Wilson Dep. at 63:1-24). Plaintiff testified that he had issues with the Boat during this time period but could not recall the nature of those issues or whether MarineMax was involved. ([46] Wilson Dep. at 62:11-20). Plaintiff, however, sent MarineMax an email in March of 2015 indicating the boat was running well. ([46] Wilson Dep. at 62:8-9; [49]).

In late March and early April of 2015, Plaintiff coordinated with MarineMax for annual maintenance and warranty repairs. ([46] Wilson Dep. at 64:23-25, 65:1-15, 66, 67:1-12; [49.2]; [49.3]; [49.4]). In April of 2015, MarineMax performed the maintenance and warranty repairs. ([46] Wilson Dep. at 67:15-25, 68, 69:1-9; [49.4]).

On, April 21, 2015, Plaintiff reported the Windlass had again failed and scheduled routine maintenance, including replacing the generator impeller. ([46] Wilson Dep. at 67:1-6; [49.3]). MarineMax suspected the issue with the Windlass was the result of it being operated incorrectly, "[because] the – two halves of the motor were just sheared and ripped right out of the front of the boat almost." ([42] Dinan Dep. at 26:16-18). MarineMax informed Plaintiff, "[o]nce [Sea Ray] receives the photos and inspect the [Windlass], if they determine it was not a manufacturing fault, they will deny the claim and charge the part and labor back to

us.  If that happens, unfortunately you would be responsible for the costs of the repair which looks to be right at $1750.  ([49.7]).  Plaintiff responded, "Let's move forward with that plan.  If Sea Ray denies the claim, I will pay."  ([49.7]).  It was subsequently determined the issue with the Windlass was not covered by a warranty and Plaintiff paid $1,750 out-of-pocket for the repair.  ([46] Wilson Dep. at 70:2-18; [49.7]).

Also in April 2015, Plaintiff experienced another issue with the generator. ([49.5]).  That issue was resolved by May 19, 2015.  ([46] Wilson Dep. at 71:12-14; [49.8]).

Plaintiff continued to experience issues with the engines and the generator in the ensuing months.  From May through July of 2015, Plaintiff and MarineMax communicated regarding maintenance and repairs to the Boat.  ([49.8]-[49.13]; [50.1]-[50.4]).  On or about June 4, 2015, Plaintiff reported "the drive not trimming at the same rate."  ([46] Wilson Dep. at 72:1; [49.9]).  Plaintiff again reported an engine misfire and that the port engine was indicating the drive lube is low.  This issue was never resolved, despite MarineMax coordinating with Mercury and its dealer, Park Marine, to address the issues.  ([46] Wilson Dep. at 72:6-24; [54.3] at ¶ 21; [55.1] at ¶ 21; [49.10]; [49.11]).  Around this same time, MarineMax coordinated to involve Lakeland Power to review issues with the

Kohler generator.  ([46] Wilson Dep. at 72:10-13, 73:3-7; [49.11]).  Plaintiff

continued to use the Boat during this time period.  ([46] Wilson Dep. at 74:9-10).

On June 25, 2015 and June 26, 2015, Dinan emailed Plaintiff regarding Park

Marine's inspection of the engine issues.  ([49.12]; [49.13]).  On July 2, 2015,

Dinan emailed Plaintiff asking if he scheduled an appointment with Park Marine

and also informed Plaintiff the parts for repairing a remote spotlight would be in

the following week.  ([50.1]).  On July 20, 2015, Dinan emailed Plaintiff again,

indicating he had been trying to contact him to see if Park Marine was helping him

with the engine issues and confirmed he had the parts to repair the spotlight.

([50.2]).  On July 27, 2015, Tom Riemann of MarineMax emailed Plaintiff

indicating Dinan was having trouble reaching him and asked Plaintiff to call him at

his earliest convenience.  ([50.3]).  Plaintiff testified that he had "no clue" why he

was not responding to MarineMax or answering their calls at this time.  ([46]

Wilson Dep. at 78:10-17).

The generator remained unrepaired (Wilson Dep. 76:2) and undiagnosed

until on or about August 3, 2015, when Dan Frazier from Lakeland Power

evaluated it.  ([54.3] at ¶ 22; [55.1] at ¶ 22).  Dan Frazier reported:

> Unit is installed backwards.  Performed service, oil filter, impeller,
> missing all vanes, broken vanes.· Check zinc, fuel filter, event history
> and parameters.  R&R spark plugs, clean flame arrestor belt tension
> pulleys attempted to crank unit but would not crank.  Starter hot,

> could turn unit by hand, return to boat with new starter, same result;
> engine hydrolocking through exhaust, removed water from exhaust
> system and cylinders, changed oil 5X Comp CYL, number 185 psi,
> CYL number 2, 155 psi, no good.· Started and ran unit, changed oil 5
> times.  Comp in CYL number 2 up to 170 psi. Hot.  Removed new
> impeller, insert vaneless hub removed prior, removed exhaust hose
> from muffler inlet and ran boat on plane.  Video shows water flow
> through genset and out exhaust.· Not Kohler problem, Sea Ray has the
> problem.

([50.5] at 1; [46] Wilson Dep. at 81-82).  The Kohler generator had 541 hours

registered at the time of Mr. Frazier's inspection.  ([50.5]).

On August 20, 2015, Plaintiff exchanged emails with MarineMax regarding

LakeLand Power's discovery of a design problem and Plaintiff requested a new

generator.  ([46] Wilson Dep. at 83:1-6; [50.6]).  On August 24, 2015, MarineMax

acknowledged: "As I suspected, they have run into this issue at some point.  I'm

looking for clarification and more input from Sea Ray on this, but the information I

received Friday was that Kohler actually required Sea Ray to change the veined

scoop pickup on the 350 DA."  ([46] Wilson Dep. at 84; [50.6] at 2)

On September 3, 2015 Wilson alerted MarineMax of issues that remained

even after the service team had made repairs:

- Warning from the Port engine for low lube level.
- Warning from the Starboard engine of a Misfire.
- Still have a milky like substance in the trim lube reservoir on the Starboard engine.
- Spot light that still doesn't work.
- Generator - your service team could never get this correct?? They were convinced that something was sucked up into the water line and that was the problem even thought water was flowing through. I had to hire an independent / third party vendor to come fix that. You have the videos, I do not think there is much more to say.
- Sadly I could go on and on.

([50.7] at 4; [46] Wilson Dep. at 85:13-22). Plaintiff expressed his frustration, stating "I am absolutely over all this!! Although Sea Ray and MarineMax used the 350 to try to resolve the nightmare that was the 330, my experience with Sea Ray and MarineMax over the last two years has been over the top and not in a good way at all!! I WANT THIS FIXED NOW!!! IN ALL OF THIS ALL I EVER WANTED WAS THE BOAT THAT I BOUGHT TO WORK!!" ([50.7] at 4-5).

On September 4, 2015 Larry Raustad, Sea Ray Customer Service Manager wrote to Bob Upchurch, Customer Service Manager for Brunswick Boat Group, outlining Plaintiff's issues with his boat. Raustad stated, "[The] biggest issue on this vessel is the generator has ingested water AGAIN." ([42.2] at 14). Raustad

described the water ingestion problem and stated he would "follow up with our engineering group on this matter as well. We had the same issue on the 420 DA a few years back, and had to do a bulleting to install a check valve into the generator muffler by pass exhaust hose." (Id.) Raustad further stated that "[i]n the end, I can see why this customer is not happy right now." (Id.)

Plaintiff and MarineMax continued to exchange correspondence about the outstanding issues through September 9, 2015. ([46] Wilson Dep. at 87:10-14, [50.7]). MarineMax scheduled a service appointment for the following week. ([46] Wilson Dep. at 85:23-25, 86:1-10, [50.7]). Plaintiff subsequently canceled the appointment. ([46] Wilson Dep. at 78:22-25, 79:1-12; [50.4]).

### 4.   Plaintiff Seeks to Return Boat and Obtain Refund

On September 16, 2015, an attorney representing Plaintiff sent a letter to MarineMax and Sea Ray that Plaintiff characterizes as "his initial letter of revocation." ([46] Wilson Dep. at 87:15-19; [54.3] at ¶ 27). The letter states:

> As you are aware, the boat has exhibited numerous issues and has failed to perform as advertised and to the satisfaction of Mr. Wilson. Those failures have continued to raise safety concerns with Mr. Wilson and it appears Sea Ray knew prior to the purchase of a design flaw in the boat that has caused some of the failures. Please be aware the boat now sits devoid of all personal property of Mr. Wilson or his family and and [sic] ready for your pickup.

([50.8]).  MarineMax's General Counsel responded on September 21, 2015, hoping for "an amicable resolution," and stating that MarineMax would be "in a position to respond shortly."  ([46] Wilson Dep. at 88:22-25, 89:1-2; [50.9]).

On November 2, 2015, a second attorney representing Plaintiff sent a letter to MarineMax and Sea Ray, seeking "the refund of his purchase price plus attorney's fees" and representing that Plaintiff would "return the 2015 Sea Ray 350 to the dealer."  ([50.10] at 1-2).  The letter summarized issues with the "nonconforming" Boat and outlined Plaintiff's legal positions.  ([50.10]; [46] Wilson Dep. at 89:17-23).

On November 17, 2015, Sea Ray issued a Service Bulletin for Sea Ray 350DA model boats to fix the generator water pick up.  ([64.1] Raustad Decl. at ¶ 12; [50.12] at 4).  With a fix to the generator issue established, Sea Ray's Legal Department responded to Plaintiff's attorney on December 3, 2015.  Sea Ray indicated it was prepared to resolve any outstanding warranty issues and characterized the generator as "the primary issue."  ([50.12] at 1).  Sea Ray stated that if Plaintiff would contact his dealer, arrangement would be made to repair the generator as described in the Service Bulletin and in full compliance with his warranty.  ([50.12] at 1; [46] Wilson Dep. at 89:12-22).  Sea Ray acknowledged that " that it is very frustrating when you purchase a new product and have

warranty issues but this particular design was new and this was a glitch that we could only identify once the product was in use" and "apologize[d] to Mr. Wilson for his frustration…" ([50.12] at 1).  To date, Plaintiff has not allowed the work in the Service Bulletin to be completed.  ([64.1] Raustad Decl. at ¶ 14).

B.    Procedural History

On January 29, 2016, Plaintiff filed a Complaint against MarineMax and Sea Ray in the Superior Court of Fulton County.  ([1.2]).  Defendants removed the action to this Court.  ([1]).

1.    Plaintiff's Claims

Plaintiff's Complaint alleges the following material defects: (1) engine error codes and failures; (2) Kohler generator replaced; (3) remote spotlight; (4) catastrophic failure of the Windlass; (5) port engine alarm indicating "Drive Lube Low"; (6) starboard engine alarm indicating "Misfire"; and (7) bilge blower failed. (Complaint, ¶¶ 3,13).  Plaintiff also identifies a design flaw in the Boat discovered on August 20, 2015, that allows water to come into the generator through the impeller inlet.  (Compl. ¶ 4).  Plaintiff asserts seven Counts against Sea Ray and MarineMax: (1) Rejection of Defective Tender; (2) Revocation of Acceptance; (3) Breach of Express Warranty; (4) Breach of Implied Warranty; (5) Breach of Written Warranty Under the Magnuson-Moss Warranty Act ("MMWA"); (6)

Breach of Implied Warranty Under the MMWA; and (7) Deceptive or Unfair Trade Practice.

### 2. Purported Damages

Plaintiff's damages expert, G. Robert Newnan, is mechanical engineer and an accredited marine surveyor with a specialty in engines. ([44.4] at 3). Plaintiff disclosed that Mr. Newman will give opinions on the diminished value of the Boat at the time of sale due to the defective conditions existing in the Boat. In his expert report, Mr. Newman notes that Plaintiff paid $273,200.79 for the Boat. ([44.4] at 6). He opines that the Boat had a value at purchase date of $136,600.40 using a "NADA" rough value criteria; $164,022.79 using a repair cost approach; and $95,620.28 using what Newman calls a knowledgeable consumer approach. ([44] Newman Dep. at 24:7-25:5; [44.4]).

Newman's report is supported by additional evidence. Defendant's Expert, Michael Griffin, prepared a repair list, noting engine problems (Code #1322 misfire), among other things, and stating that the generator does not turn over. ([45.4]). In addition, a MarineMax Work Order History Report documents the extensive work performed on the Boat totaling over $30,300.00 in repairs and maintenance costs. ([42.4]).

### 3.　The Pending Motions

Defendants moved for summary judgment on all counts.  ([38], [40]).  In response, Plaintiff withdrew the claims for Rejection of Defective Tender (Count I) and Deceptive or Unfair Trade Practice (Count VII) against both defendants.  ([54] at 1 n.1).  Plaintiff also withdrew the claim for Revocation of Acceptance against Defendant Sea Ray.  (Id.).  Plaintiff also moved to exclude the Declaration of McLamb ([53]).  Michael McLamb, a MarineMax corporate representative, testified in support of summary judgment that MarineMax was not a party to the Extended Warranty entered into between Plaintiff and Brunswick Product Protection Corporation, that MarineMax offers its own service contracts, and that Plaintiff did not purchase a MarineMax warranty.  ([64.2] at ¶¶ 8-10).  Plaintiff contends that the McLamb declaration should be excluded because Defendants failed to identify McLamb as a potential witness in Defendant's Initial Disclosures or in response to interrogatories.  ([53] at 1).

In addition to moving for summary judgment, Defendants also moved to exclude the opinion testimony of Mr. Newman on damages.  ([39]).  Defendants contend that Mr. Newman lacks the requisite qualifications to offer opinion testimony on the diminished value of the Boat at the time of sale.  ([39.1] at 4).

Defendants also contend that Mr. Newman's opinions are not based on sufficient facts and are not the product of reliable principles and methods. ([39.1] at 7, 9).

Finally, Plaintiff moved pursuant to Fed. R. Civ. P. 37 to strike the McLamb declaration submitted by MarineMax in support of summary judgment. ([53]). Plaintiff asserts that Defendants did not identify Mr. McLamb in their Initial Disclosures or in Response to Interrogatories.

## II.    DISCUSSION

### A.    Legal Standard

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). The nonmoving party "need not present evidence in a form

necessary for admission at trial; however, he may not merely rest on his pleadings." Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment. Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary

verdict." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quotations omitted).

B.    Analysis

    1.    Count II:  Revocation of Acceptance Against MarineMax

MarineMax contends that Plaintiff cannot sustain a claim for revocation of acceptance under O.C.G.A. § 11-2-608.  ([40.1] at 13).  That statute provides:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it:
>
> > (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
> >
> > (b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the sellers assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects.  It is not effective until the buyer notifies the seller of it.
>
> (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

O.C.G.A. § 11-2-608.  "The issues of whether an effective revocation of acceptance was made, whether reasonable notice of revocation was given to the seller, and whether the value of the goods was substantially impaired are ordinarily matters for determination by the trier of fact, even where the buyer has continued

to use nonconforming goods after an alleged revocation of acceptance." <u>Gill v.</u>

<u>Blue Bird Wanderlodge</u>, No. 5:02-CV-328-2(CAR), 2004 U.S. Dist. LEXIS

27437, at *15 (M.D. Ga. Feb. 24, 2004) (citations omitted). "However, cases

involving issues which are not usually susceptible to summary adjudication may

properly be resolved as a matter of law by means of summary judgment if the

uncontroverted facts establish that a plaintiff is not entitled to recover." <u>Id.</u>

Here, MarineMax does not challenge that sufficient evidence exists for a

reasonable jury to find that the defects in the Boat substantially impaired its value

to Plaintiff. MarineMax argues two grounds for finding that Plaintiff's revocation

claim is precluded: (1) Plaintiff's delay in notifying MarineMax of his intent to

revoke; and (2) Plaintiff's post-rejection use of the Boat. The Court addresses each

of those arguments.

          a.     <u>Does Plaintiff's Delay in Notifying MarineMax of His</u>
                <u>Intent to Revoke Acceptance of the Boat Preclude</u>
                <u>Plaintiff's Revocation Claim?</u>

MarineMax contends that Plaintiff's extensive use of the Boat for over 20

months before formally revoking acceptance in November 2015 constitutes an

unreasonable delay and bars Plaintiff's revocation claim as a matter of law. The

Court disagrees. Viewing the evidence in the light most favorable to Plaintiff, a

reasonable jury could conclude that Plaintiff's boat suffered from design flaws and

recurring defects that substantially impaired the value of the Boat, that Plaintiff afforded MarineMax a reasonable opportunity to correct and repair the flaws and defects, and that Plaintiff timely notified them of his intent to revoke acceptance after MarineMax's repeated repair attempts failed.

Looking at the issues with the generator, which provides power to the electrical systems on the Boat, the evidence shows that it suffered multiple failures throughout the ownership period and Plaintiff afforded MarineMax ample opportunities to correct the problem. While the generator would work for a short time after being repaired or replaced, problems persisted. Ultimately, MarineMax and Sea Ray acknowledged the Boat suffered from a design defect that permitted water to enter the generator engine. Plaintiff afforded MarineMax more than five weeks to correct the design defect, after Mr. Frazier first reported its existence following his August 3, 2015, inspection, before sending the September 16, 2015, letter to MarineMax and Sea Ray that a reasonable jury could consider Plaintiff's "initial letter of revocation." ([46] Wilson Dep. at 87:15-19; [54.3] at ¶ 27). Though Sea Ray had previously encountered and corrected a similar design defect on a different model of boat, neither Sea Ray nor MarineMax discovered the defect in Plaintiff's boat during the first 17 months of ownership despite repeated failures of the generator, some involving water ingestion, and multiple repair attempts.

Even after Defendants acknowledged the defect, they did not provide a fix for Plaintiff's Boat until issuance of the November 17, 2015, Service Bulletin. That was two months after Plaintiff's "initial letter of revocation" and two weeks after Plaintiff's November 2, 2015, letter from counsel that even Defendants acknowledge is a formal letter of revocation. A jury could reasonably conclude that Plaintiff timely notified MarineMax of his intent to revoke acceptance upon first discovering that the generator issues were not the result of repeated malfunctions, but were caused by an inherent design defect for which Defendants had no existing fix.

That Plaintiff also simultaneously experienced numerous issues with the port and starboard engines during the ownership period that reoccurred despite repeated repair attempts provides additional evidence a jury could use to reasonably conclude that Plaintiff timely and sufficiently notified MarineMax of his intent to revoke acceptance. Use of OCGA § 11–2–608 to revoke acceptance of the equipment because of seller breached its warranty to provide timely repair is "a remedy cognizable under Georgia law." Stephens v. Crittenden Tractor Co., 370 S.E.2d 757, 762 (Ga. Ct. App. 1988) (trial court erred in granting directed verdict for seller where questions of fact existed regarding whether seller breached warranty to repair buyer's equipment and whether revocation was made within a

reasonable time pursuant to O.C.G.A. § 11-2-608(2)).  A reasonable jury could conclude that Plaintiff understandably did not reach the conclusion that MarineMax would be unable to resolve issues with the engines until those issues persisted through the summer of 2015, just before Plaintiff sent his "initial letter of revocation."

MarineMax makes good arguments that it promptly acted to repair problems raised by Plaintiff and that Plaintiff was able to use the Boat on a regular basis, particularly during the August 2014 to March 2015 time period without meaningful incident.  But the facts are not so compelling as to warrant summary judgment. Mauk v. Pioneer Ford Mercury, 709 S.E.2d 353, 356 (Ga. Ct. App. 2011) (whether buyer's revocation was timely when car had more than 12,000 miles on it when tendered was question of fact for the jury to decide); Franklin v. Augusta Dodge, Inc., 652 S.E.2d 862, 865 (Ga. Ct. App. 2007) ("[a]voidance of an absolute rule against continued use is counseled by the overriding requirement of reasonableness which permeates the [UCC].").  The repeated failures or problems experienced with the same key components, the engines and generator, throughout the period of ownership and MarineMax's inability to resolve those problems despite assurances that those problems would be fixed raise issues for consideration by the jury. Mauk, 709 S.E.2d at 356; Bakery Servs., Inc. v. Thornton Chevrolet, Inc., 479

S.E.2d 363, 369 (Ga. Ct. App. 1996) ("[E]vidence may show that the owner was justified in continuing to drive the vehicle because the seller made assurances that the defect would be cured."); see Rester v. Morrow, 491 So. 2d 204, 210 (Miss. 1986) (applying Mississippi U.C.C., reversing directed verdict for seller, and stating "[t]here comes a time when enough is enough—when an automobile purchaser, after having to take his car into the shop for repairs an inordinate number of times and experiencing all of the attendant inconvenience, is entitled to say, 'That's all,' and revoke, notwithstanding the seller's repeated good faith efforts to fix the car.").

The cases cited by MarineMax ([40.1] at 14-16) do not compel a different conclusion. The court in Imex Int'l v. Wires Eng'g, 583 S.E.2d 117, 122 (Ga. Ct. App. 2003) held that revocation six months after delivery of diamond wire machine was ineffective. But that case addressed a transaction between merchants, focused primarily on the buyer's right to reject, and did not involve repeated failures to repair upon or assurances of repair upon which the buyer could reasonably rely to extend a reasonable date for revocation. The court in Cobb Cty. Sch. Dist. v. MAT Factory, Inc., 452 S.E.2d 140 (Ga. Ct. App. 1994), addressed the buyer's right to reject, not a revocation of acceptance claim under O.C.G.A. § 11-2-608, much less under the circumstances present here.

b. Did Plaintiff's Use of Boat After Revocation Constitute Reacceptance?

MarineMax argues that "[e]ven assuming Plaintiff's 20-month delay in rejecting or revoking acceptance of the Boat does not preclude his claims, his excessive post-rejection use of the vessel does." ([40.1] at 16). "[A] buyer who purports to revoke his acceptance of goods may be found to have re-accepted them if, after such revocation, he performs acts which are inconsistent with the seller's ownership of the goods." Griffith v. Stovall Tire & Marine, Inc., 329 S.E.2d 234, 236 (Ga. Ct. App. 1985); Gill, No. 5:02-CV-328-2 (CAR), 2004 U.S. Dist. LEXIS 27437, at *16 (plaintiff found to have reaccepted motor home where he drove it 13,000 miles after sending a letter of revocation and 5,000 miles after filing). In support of its reacceptance argument, MarineMax states:

> Plaintiff's Boat was inspected May 22, 2016 and revealed 509.2 engine hours on the Boat. (Griffin Dep. 6:7-13). A follow-up inspection, conducted on January 30, 2017, showed the engine had 581.6 hours. (Id.). These hours, which reflect substantial and atypical use of the Boat, also reveal Plaintiff put over 70 hours on the Boat after the commencement of the Lawsuit.

([40.1] at 17).  But Plaintiff testified that he did not use the Boat after sending his "initial letter of revocation."[1]  ([46] at 101-02).  Plaintiff also testified that the "hours meters do not work correctly" and that the hours meters click when you leave the keys on, even if the boat is not running.  ([46] Wilson Dep. at 97:25, 98:1-19).  This testimony raises a genuine issue of material fact for consideration by the jury, especially since MarineMax offers no other evidence of Plaintiff's post-revocation use to corroborate the disputed hours meters.  This is not a case like Gill, upon which MarineMax heavily relies, where plaintiff "offer[ed] no evidence of assurances" of repair and admitted substantial post-revocation and post-suit use of the defective vehicle.  Gill, No. 5:02-CV-328-2 (CAR), 2004 U.S. Dist. LEXIS 27437, at *18-19.

MarineMax's motion for summary judgment on Count II (Revocation of Acceptance) is denied.

---

[1]  MarineMax states in its reply brief that "[Plaintiff's] testimony, as well as his son's, reveals substantial use before and after the lawsuit."  ([56] at 5, citing Pl. Dep. 49:24-50:4).  The cited testimony does not support use of the Boat after the lawsuit, nor is the Court aware of any such testimony.

2. The Warranty Claims

a. Count III:  Breach of Express Warranty Against
MarineMax

MarineMax asserts that it cannot be liable for breach of express warranty because no express warranty exists between Plaintiff and MarineMax.  ([40.1] at 19).  Plaintiff argues that "Plaintiffs were provided an express written warranty in writing by Defendant MarineMax."  ([54] at 13).  Plaintiff argues that MarineMax delivered the Sea Ray Limited Manufacturer Warranty [47.2] to Plaintiff with the Boat it sold, the warranty instructs Plaintiff to contact the selling dealer (i.e. MarineMax) to schedule repairs, and MarineMax assumed performance of the manufacturer's warranty by making repairs thereunder."  ([54] at 13). Plaintiff maintains that "[t]he similarities between this case and the Freeman v. Hubco Leasing, 253 Ga. 698 (1985) case are striking."  ([54] at 14-15).  The Court disagrees.

In Freeman, the court held that a dealer could be liable for breach of express warranty, despite disclaiming all warranties in its agreement with the plaintiff, in the unique circumstance where "the manufacturer's warranty [was] adopted and transmitted by the dealer."  Freeman v. Hubco Leasing, Inc., 324 S.E.2d 462, 467 (Ga. 1985).  The manufacturer's warranty in Freeman stated that "DMC DEALERS will correct such defects by repair or adjustment . . . and its DMC

31

dealers' sincere intention to provide owners with the full benefits of these warranties." Freeman, 324 S.E.2d at n.1.[2]

The Sea Ray manufacturer warranty here merely states that "Sea Ray . . . warrants . . . that the selling dealer will repair or replace, at its sole discretion, any defects in the material or workmanship in the Sea Ray Boat . . . ."[3] ([47.2] at 2). The warranty even anticipates a scenario where "the original selling dealer is no longer authorized" by Sea Ray to do warranty work. ([47.2] at 2). The Sea Ray warranty obligates Sea Ray, not the selling dealer, to address warranty issues. Nothing in the Sea Ray warranty, or the circumstances of this case, suggests that MarineMax adopted or assumed performance of the Sea Ray manufacturer warranty. See Hemmings v. Camping Time RV Centers, LLC, No. 1:17-CV-1331-TWT, 2017 WL 4552896, at *4–7 (N.D. Ga. Oct. 11, 2017) (distinguishing

_____

[2]    In reaching its conclusion that the dealer adopted the manufacturer warranty, the Freeman court relied on Ventura v. Ford Motor Corp., 433 A.2d 801, 807 (N.J. Super. Ct. 1981). The dealer in Ventura transmitted the manufacturer's warranty and also agreed "to promptly perform and fulfill all terms and conditions of the owner service policy." Freeman, 324 S.E.2d at 467.

[3]    MarineMax argues that the clause "at its sole discretion" evidences that MarineMax was not obligated to make repairs to Plaintiff's Boat. ([56] at 11). More likely, the clause means that the selling dealer retains discretion to either repair defects or replace defective parts. Resolution of this issue is not necessary to the Court's ruling. The Court does not rely on MarineMax's dubious interpretation.

Freeman and finding that camper dealer did not adopt manufacturer's express warranty). To the contrary, the purchase agreement states that the Boat is "only subject to applicable manufacturer's warranties," that MarineMax sold the Boat "As Is," and that MarineMax "makes no warranties on its own behalf." ([46.6] at 2). Without evidence that MarineMax expressly adopted the Sea Ray warranty, these disclaimers are effective. Hemmings, No. 1:17-CV-1331-TWT, 2017 WL 4552896, at *4–7; Reed v. General Motors, 1993 Mont. Dist. LEXIS 470 *9 (Mont. Dist. Ct. 1993) (criticizing Plaintiff's interpretation of Freeman and holding that a dealer is not obligated under the manufacturer's warranty "unless it has provided its own written warranty or has adopted that of the manufacturer."); 15 U.S.C. § 2307 ("Nothing in this chapter shall be construed to prevent any warrantor from designating representatives to perform duties under the written or implied warranty: *Provided*, That such warrantor shall make reasonable arrangements for compensation of such designated representatives, but no such designation shall relieve the warrantor of his direct responsibilities to the consumer or make the representative a cowarrantor." (emphasis added)).

MarineMax's motion for summary judgment of no breach of express warranty by MarineMax is granted.

b.　　Count III:  Breach of Express Warranty Against Sea Ray

Sea Ray argues "there is no evidence Sea Ray breached the limited warranty" it provided Plaintiff upon purchase of the Boat.  ([38.1] at 13).  Sea Ray makes the additional argument that Plaintiff's warranty claims should be summarily denied because Plaintiff failed to present competent evidence of damages.  ([38.1] at 22).

i.　　Liability for Breach of Express Warranty

Sea Ray addresses each of the Boat defects Plaintiff has identified:  (1) engines; (2) generator; (3) remote spotlight; (4) windlass; (5) bilge blower; and (6) the generator water-pickup.  (Compl. ¶¶3-4,13).  For each of those defects, Sea Ray argues that: (1) the defect is not covered by the Sea Ray limited warranty (e.g. engines and generator); (2) the defect is already repaired (e.g. windlass); or (3) Plaintiff refused to allow repairs (e.g. spotlight, blower, generator water-pickup). In response, Plaintiff argues only the "generator issues" as a basis for breach of express warranty.  ([54] at 20).

Sea Ray acknowledges "full responsibility for the repair of the [generator] water pickup" but argues that "Plaintiff's refusal to allow the repair [] defeats his breach of warranty claim under Georgia law.  ([55] at 3, citing Monticello v. Winnebago Indus., 369 F. Supp. 2d 1350, 1357 (N.D. Ga. 2005) ("Georgia Courts

have found no breach of warranty where the plaintiff has received some repairs under the warranty but fails to return to the manufacturer or its authorized dealer for a final attempt to repair.")).  Sea Ray maintains that the "undisputed repair history ultimately does not support a breach of warranty claim under Georgia law where the extent of the problem was entirely unknown until August of 2015" and Plaintiff did not provide an opportunity to repair the water pickup defect once it was discovered.  ([55] at 4).  The Court disagrees.

Viewing the evidence in the light most favorable to the Plaintiff, a reasonable jury could conclude that Plaintiff afforded Sea Ray sufficient opportunity to repair the generator issue and breached the limited warranty by failing to timely repair the defect.  This is not a case like those cited by Sea Ray where the plaintiff failed to provide notice of the defect, only provided one opportunity to repair the defect, or the defect was corrected.  ([55] at 4-5, citing Car Transp. Brokerage Co. v. Blue Bird Body Co., 322 F. App'x 891, 898 (11th Cir. 2009) ("Providing only one opportunity to repair -- before the extent of the defect was truly apparent -- is not reasonable).

Here, it is undisputed the Boat suffered from a design defect in the water pickup that allowed the generator engine to ingest water.  While Plaintiff experienced numerous issues with the generator beginning shortly after taking

delivery in March 2014, it is undisputed that the defect in the water pickup caused water ingestion and a generator failure on at least two occasions, July 2014 and June 2015. The first repair attempt was the replacement of generator in the summer of 2014. The second generator repair attempt began in June 2015. The generator problem remained unresolved through the summer of 2015 up until Plaintiff canceled a service appointment in September 2015 and sought to return the Boat. An independent technician discovered the design defect during an August 3, 2015, inspection. Sea Ray did not offer a fix at any time before Plaintiff canceled the September 2015 service appointment. Sea Ray did not notify Plaintiff of a fix for the problem until November 2015. A reasonable jury could find on these facts that Sea Ray failed to timely repair the water pickup defect and fix the generator problem. That is especially true where the evidence, construed in the light most favorable to Plaintiff, suggests that Sea Ray had knowledge of a same or similar defect in previous boats. ([46] Wilson Dep. at 84; [50.6] at 2 ("As I suspected, they have run into this issue at some point. I'm looking for clarification and more input from Sea Ray on this, but the information I received Friday was that Kohler actually required Sea Ray to change the veined scoop pickup on the 350 DA."); [42.2] at 14 ("We had the same issue on the 420 DA a few years back.")).

ii.     Damages for Breach of Express Warranty

Sea Ray makes the additional argument that Plaintiff's warranty claims should be summarily denied because Plaintiff failed to present competent evidence of damages.  ([38.1] at 22).  "A plaintiff in a warranty case must show the difference between the fair market value of the vehicle as warranted and its fair market value as delivered in the allegedly defective condition."  Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1200–01 (N.D. Ga. 2005) (citing Fiat Auto USA, Inc. v. Hollums, 363 S.E.2d 312, 315 (Ga. Ct. App. 1987); Chrysler Corp. v. Marinari, 339 S.E.2d 343, 345 (Ga. Ct. App. 1985)).  Both Defendants move to exclude the opinion testimony of Plaintiff's damages expert, Robert Newman.  ([39.1]).

a.     Mr. Newman's Opinions

Mr. Newman is a Registered Professional Engineer with a Masters of Science in Mechanical Engineering.  ([39.2] at 4).  He has 48 years of mechanical engineering experience.  (Id.)  He is an "Accredited Marine Surveyor – Engines (Specialty Marine Engines and Mechanical/Electrical Systems).  (Id.)

Plaintiff states that Mr. Newman will give expert opinions on "[t]he diminished value of the subject boat at the time of sale due to the defective conditions existing in the boat" in accordance with his expert report.  ([39.2] at 3).

Mr. Newman's expert report provides his valuation opinion using three different methodologies:

1. Method 1 (NADA): Based on "NADAGUIDES BOAT Pricing," the Boat is in "Rough Retail" condition and valued at $136,600.40 or 50% of the purchase price;

2. Method 2 (Engineering Approach): Based on the "estimated cost to correct all of the problems with the vessel" of $109,178, the Boat is worth $164,022.79 (the price paid of $273,200.79 minus $109,178). The $109,178 value reduction includes interest of $46,577.55 on the purchase price paid because "this pleasure craft has [n]ever been used trouble free or in a pleasurable way."; and

3. Method 3 (Salvage Value): Based on "someone interested in salvaging the boat for resale at a profit," the "maximum amount a knowledgeable person in the boat business would pay for this vessel with the intention to repair all problems and resale at a profit" is "35% to 40% of the originally purchased value" or $95,620.28.

([39.2] at 5-8).

b.     <u>Standards for Expert Testimony</u>

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

b)     the testimony is based on sufficient facts or data;

c)     the testimony is the product of reliable principles and methods; and

d)      the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 703 further provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court explained that trial courts must act as "gatekeepers" tasked with screening out "speculative, unreliable expert testimony."  Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010) (citing Daubert, 509 U.S. at 597, n.13).  "In that role, trial courts may consider a non-exhaustive list of factors including (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the technique; and (4) whether the technique is generally accepted in the scientific community."  Adams v. Lab. Corp. of Am., 760 F.3d 1322, 1327 (11th Cir. 2014) (citing Kilpatrick, 613 F.3d at 1335).  Later, in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), the Court explained that the gatekeeping

function governs all expert testimony based on "scientific, technical, or other specialized knowledge," not just scientific testimony. 526 U.S. at 147-49. Kumho emphasized that the goal of gatekeeping is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152.

Courts must consider whether:

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Seamon v. Remington Arms Co., LLC, 813 F.3d 983, 988 (11th Cir. 2016) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).

As to the first prong—qualifications—"experts may be qualified in various ways," including by scientific training, education, and experience. United States v. Frazier, 387 F.3d 1244, 1260-61 (11th Cir. 2004). That is, "[w]hile scientific training or education may provide a possible means to qualify, experience in a field may offer another path to expert status." Id. at 1261.

The second prong—reliability—concerns "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. The district court may consider

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.

Seamon, 813 F.3d at 988 (citing McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004)). "This list is not exhaustive; the district court may take other relevant factors into account. In assessing reliability, the court must focus solely on principles and methodology, not on the conclusions that they generate." Id. at 988 (quotations omitted).

Finally, the third prong—helpfulness, or fit—"goes primarily to relevance." Daubert, 509 U.S. at 591. "The basic standard of relevance . . . is a liberal one, but if an expert opinion does not have a valid scientific connection to the pertinent inquiry it should be excluded because there is no 'fit.'" Seamon, 813 F.3d at 988 (internal citations and quotations omitted).

c.    Analysis

Plaintiff failed to present competent evidence of damages in this case.  As an

initial matter, Mr. Newman is an Accredited Marine Surveyor – Engines.  While

Mr. Newman has extensive training and experience as a mechanical engineer, he

has no professional experience in boat valuation.  Atl. Rim Equities, LLC v.

Slutzky, Wolfe & Bailey, LLP, No. 1:04-CV-2647-WSD, 2006 WL 5159598, at *4

(N.D. Ga. Nov. 21, 2006) ("Determining whether a witness is qualified to testify as

an expert "requires the trial court to examine the credentials of the proposed expert

in light of the subject matter of the proposed testimony."); Jack v. Glaxo

Wellcome, Inc., 239 F. Supp. 2d 1308, 1314-16 (N.D. Ga. 2002) (stating that the

court's finding that the proposed expert was "well-trained, highly educated, and

experienced," and possessed an "extremely impressive professional track record"

with respect to his specialty "does not obviate the need for a more thorough

analysis of whether [the expert] is qualified and competent to testify as an expert as

to the subject matter of his proposed testimony").  Mr. Newman testified that his

accreditation is a specialty involved in propulsion, diesel engines, gasoline engines,

anything mechanical, hydraulic, and electrical.  ([44] Newman Dep. at 6:11-20).

In contrast, a general surveyor surveys an entire vessel, but Mr. Newman does not

do that.  ([44] Newman Dep. at 7:1-6).  Mr. Newman has worked on one matter

involving the value of very large engines in a tug boat based on the history of maintenance of the engines. ([44] Newman Dep. at 11:4-15). Nothing in the record, however, suggests that Mr. Newman has experience in overall boat valuation or the general value of boats, defective or not, in the market. Fedrick, 366 F. Supp. 2d at 1202 (citing Monroe v. Hyundai Motor America, Inc., 606 S.E.2d 894 (Ga. Ct. App. 2004)) (affirming trial court's decision to strike plaintiff's statements relating to valuation based on past experience and research in car market where he did not testify his past vehicle purchases included purchases of vehicles with the purported defects or what issue in the case his "research" involved.).

The valuation opinions offered by Mr. Newman are also suspect in that: (1) he did not see the boat in operation ([44] Newman Dep. at 43:7-11 (he witnessed the engines start, but Plaintiff did not want the boat taken out)); (2) he did not start the generator or otherwise assess its current functionality ([44] Newman Dep. at 29:10-17); (3) he did not review service records for the Boat ([44] Newman Dep. at 58:10-21); and (4) he did not consider the testimony of MarineMax's technicians regarding issues with the Boat. ([44] Newman Dep. at 33:22-25).

With that backdrop, the Court finds that Newman's three valuation methodologies are not reliable. With respect to Method 1 (NADA), Newman has

not shown that the "NADAGUIDES BOAT Pricing" is reasonably relied on by experts in valuing defective boats. Newman does not define the standards used by those in the industry to determine whether a boat is in "clean," "average," or "rough" condition in accordance with the NADA guide. ([39.2] at 5).[4] Newman's report provides no analysis justifying his classification of the Boat as being in "rough" condition. (Id.). During his deposition, Newman testified that the boat "doesn't run" and "has lots of problems" before stating that, in his judgment the Boat would fall in the "rough" category. ([44] Newman Dep. at 24-25). But the assertion that the Boat does not run contradicts his own testimony that the engines started. And Newman provides no explanation of why those experienced in boat valuation would conclude that the specific problems remaining with the Boat warranted an assessment of a "rough" condition.[5] United States v. Frazier, 387

---

[4]     This opinion also is not helpful to the jury. Based on Newman's description of how he used the NADAGUIDES, his use of the book does not require any particular expertise or specialized knowledge, providing another reason to exclude his testimony on this "valuation" method.

[5]     Newman testified that he chose "rough" instead of "average" condition based his understanding of the history that there were "a lot of attempts to fix these problems, and they haven't been fixed." ([44] Newman Dep. at 25:15-23). But Newman did not review the service records, much less provide specific details on how the repair attempts impacted valuation of the Boat.

F.3d 1244, 1265 (11th Cir. 2004) ("Since [the expert] was relying solely or primarily on his experience, it remained the burden of the proponent of this testimony to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case."). Newman's Method 1 opinion is not reliable.

With respect to Method 2 (Engineering Approach), Newman admits that he has "never seen [valuation] done that way." ([44] Newman Dep. at 18:18-23). He includes the cost of replacing the generator even though he does not know that it needs replaced. ([44] Newman Dep. at 42:18-21). Without providing any analysis of why the fix to the water pickup proposed by Sea Ray in the November 2015 Service Bulletin would not work, Newman includes the cost of a $16,000 design change of his own in his valuation. Newman's Method 2 further includes a devaluation of the Boat based on interest Plaintiff would have received if he had invested the purchase price of the Boat. Plaintiff offers no defense of this element of Newman's damages opinion and the Court finds that it has no bearing on the fair market value of the boat as warranted or as delivered, the only inquiry relevant to warranty damages. The Court finds Method 2 unreliable and likely to confuse the jury with irrelevant testimony.

With respect to Method 3 (Salvage Value), Newman states that this approach is based on calculating "the diminished value based on running the business to make a profit and purchase the vessel." ([44] Newman Dep. at 48:16-25). Newman makes no showing of how the salvage value relates to the fair market value of the Boat or why the boat should be devalued to allow a profit for the purchaser on resale. Newman also fails to provide any justification that salvage value would be 35% to 40% of the originally purchased value. Hughes v. Kia Motors Corp., 766 F.3d 1317, 1329 (11th Cir. 2014) (Affirming district court's exclusion of expert testimony where "expert never explained *how* his experience or the relevant texts supported his opinion" and the "basis for the opinion was left unstated"). The Court finds Method 3 unreliable and not helpful to the jury.

Defendants' Motion to Exclude Opinion Testimony of Robert Newman [39] is granted and Newman's expert testimony on valuation is excluded as unreliable.

Plaintiff offers nothing beyond Mr. Newman's unreliable opinions to establish damages. Warranty damage evidence must be competent. Fedrick, 366 F. Supp. 2d at 1200–01 (citing Colonial Pipeline Co. v. Williams, 425 S.E.2d 380, 382 (Ga. Ct. App. 1992). "Failure to present competent evidence of damages entitles a defendant to summary judgment." Id. (citing Dixon Dairy Farms, Inc. v.

Conagra Feed Co., 538 S.E.2d 897, 899 (Ga. Ct. App. 2000)).  Sea Ray's motion

for summary judgment of no breach of express warranty by Sea Ray is granted.[6]

c.　　Count IV:  Breach of Implied Warranty of
　　　　Merchantability Against MarineMax

Under Georgia law, "a warranty that the goods shall be merchantable is

implied in a contract for their sale if the seller is a merchant with respect to goods

of that kind."  O.C.G.A. § 11-2-314(1).  MarineMax asserts that it effectively

disclaimed all warranties, including the implied warranty of merchantability, in the

Purchase Agreement.  ([40.1] at 20).

O.C.G.A. § 11-2-316 governs the disclaimer of warranties.  It provides that

"[s]ubject to subsection (3) of this Code section, to exclude or modify the implied

warranty of merchantability or any part of it the language must mention

merchantability and in case of a writing must be conspicuous, and to exclude or

modify any implied warranty of fitness the exclusion must be by a writing and

conspicuous."  O.C.G.A. § 11-2-316.  Subsection (3) further provides that

"[u]nless the circumstances indicate otherwise, all implied warranties are excluded

---

[6]　　Plaintiff's lack of competent evidence of damages also provides an
additional ground justifying summary judgment on Plaintiff's warranty claims
against MarineMax.

by expressions like "as is" . . . ."  O.C.G.A. § 11-2-316(3)(a).  A term is

"conspicuous" if it is "so written, displayed, or presented that a reasonable person

against which it is to operate ought to have noticed it."  O.C.G.A.

§ 11-1-201(b)(10).  This includes "[a] heading in capitals equal to or greater in size

than the surrounding text, or in contrasting type, font, or color to the surrounding

text of the same or lesser size" and "[l]anguage in the body of a record or display

in larger type than the surrounding text, or in contrasting type, font, or color to the

surrounding text of the same size, or set off from the surrounding text of the same

size by symbols or other marks that call attention to the language."  Id.

The disclaimer here meets these requirements.  The Purchase Agreement

disclaims warranties in paragraph 2:

> DISCLAIMER OF WARRANTIES:  **THE BOAT, MOTOR AND ACCESSORIES BEING PURCHASES PURSUANT TO THIS AGREEMENT ARE SOLD BY SELLER "AS IS" AND SELLER MAKES NO WARRANTIES ON ITS OWN BEHALF, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE**, *unless* Seller gives Buyer a written warranty on its own behalf or Seller enters into a service contract in connection with this sale or within 90 days of sale then any implied warranties shall be limited in duration to the duration of Seller's written warranty or service contract.

([46.6] at 2).  The disclaimer is bolded and in capitals.  It also specifically states

the Boat is sold "As Is" and mentions the word "merchantability."  The disclaimer

meets the requirements of O.C.G.A. § 11-2-316.

Plaintiff argues that MarineMax may not exclude warranties because it

entered into a service contract with Plaintiff by issuing the Extended Warranty

from Brunswick Product Protection Corporation.  ([54] at 16-19); [46.8]).  Plaintiff

relies on Patton v. McHone, 822 S.W.2d 608 (Tenn. Ct. App. 1991) to assert that

MarineMax, as the issuing dealer, is a party to the Extended Warranty and

therefore entered into a service contract that precludes a disclaimer of implied

warranties.  ([54] at 17-18).  The court in Patton found that a car dealer that earned

a commission by selling an extended service contract that required the buyer to

obtain service from the dealer, absent special permission to go elsewhere, was

precluded from disclaiming implied warranties.  Patton, 822 S.W.2d at 617 n.16.

Here, there is no evidence that MarineMax received a commission as the issuing

dealer of the Extended Warranty or that the Extended Warranty required Plaintiff

to obtain service from MarineMax, much less that MarineMax was obligated to

provide service under the Extended Warranty.[7]  A dealer's facilitating of the

purchase of a service contract by another warranty provider does not make the

dealer a party to the service contract such that implied warranties cannot be

disclaimed.  Priebe v. Autobarn, Ltd., 240 F.3d 584, 588 (7th Cir. 2001) (service

contract sold by dealer did not prevent dealer from disclaiming implied warranties

because the dealer was not bound to repair the car); Wait v. Roundtree Mobile,

LLC, No. 15-00285-CG-M, 2015 WL 6964668, at *6 (S.D. Ala. Nov. 10, 2015)

(dealer's disclaimer of implied warranties valid where buyer entered into service

contract with third party); Hamilton v. O'Connor Chevrolet, Inc., 399 F. Supp. 2d

860, 871 (N.D. Ill. 2005); Whitehead v. John Bleakley RV Ctr., Inc., No. 1:09-CV-

468-TWT, 2010 U.S. Dist. LEXIS 21128, at *17 (N.D. Ga. Mar. 8, 2010)

("Warranty Support Services, not [the dealer], entered into the service contract

with the Plaintiff.  The service contract states that 'Warranty Support Services

LLC' is the 'Issuing Provider' of the service contract.  Even the Plaintiff has said

that 'Bleakley arranged the sale of a service contract.").[8]

---

[7]     The record includes the registration page for the Extended Warranty [46.8],
but not the Extended Warranty itself.

[8]     The cases Plaintiff cites in note 8 do not compel a different conclusion as
each involved a dealer that undertook obligations beyond just selling a third-party

MarineMax's motion for summary judgment of no breach of implied

warranty by MarineMax is granted.[9]

---

warranty or different disclaimer language.  ([54] at 18 n.8); <u>Villanueva v. Toyota Motor Sales, U.S.A., Inc.</u>, 869 N.E.2d 866 (Ill. App. Ct. 2007) (genuine issue existed whether dealer was party to an extended service agreement where agreement required buyer to contact dealer for repairs); <u>Payne v. Berry's Auto, Inc.</u>, 2013 MT 102, ¶ 19, 369 Mont. 529, 536, 301 P.3d 804, 809 (Buyer's Guide "provision did not condition implied warranties upon Payne's purchase of a service contract directly from [dealer]; it only required that a service contract be purchased."); <u>Gen. Motors Acceptance Corp. v. Jankowitz</u>, 523 A.2d 695, 701–702 (N.J. Super. Ct. App. Div. 1987) (dealer's adoption of manufacturer warranty precluded disclaimer of implied warranties); <u>Ventura v. Ford Motor Co.</u>, 433 A.2d 801, 809 (N.J. Super. Ct. App. Div. 1981) (dealer's undertaking to fulfill the terms and conditions of the "owner service policy" issued by the manufacturer was a written warranty that prevented disclaimer of implied warranties).

[9]      In support of its motion, MarineMax submitted a declaration from Michael McLamb, President of MarineMax.  ([64.2]).  Mr. McLamb provided testimony regarding the internal policies and procedures at MarineMax as they relate to service contracts.  In particular, Mr. McLamb stated that the Brunswick Extended Warranty is distinct from service contracts MarineMax offers to customers, that MarineMax is authorized to alert customers to the Brunswick Extended Warranty and arrange for customers to obtain a service contract from Brunswick, and that Plaintiff did not purchase or obtain any service contracts from MarineMax for the Boat.  ([64.2] McLamb Decl. at ¶¶ 8-10).  Plaintiff moved pursuant to Fed. R. Civ. P. 37 to strike the McLamb declaration for Defendants' failure to disclose him as a witness in their Initial Disclosures or in Response to Interrogatories.  [53].  The Court's decision does not rely on the testimony of Mr. McLamb and the motion is moot.  To the extent Mr. McLamb offers testimony as a corporate representative, either his disclosure was not required or, if disclosure was required, Defendants' failure to disclose him was harmless.  <u>Moore v. Computer Assocs. Int'l, Inc.</u>, 653 F. Supp. 2d 955, 959 (D. Ariz. 2009) (Rule 26 does not require disclosure of

d.    Count IV:  Breach of Implied Warranty of
      Merchantability Against Sea Ray

Sea Ray argues that "Plaintiff's use of the boat defeats his claim for breach

of implied warranty."  ([38.1] at 20-22).  Plaintiff failed to address Sea Ray's

argument even though it spans several pages of its opening brief and includes

numerous case cites.  "Failure to respond to an opposing party's argument results

in abandonment of the claim."  McDaniel v. Wells Fargo Bank, N.A., No. 1:14-

CV-2337-WSD, 2016 WL 1071101, at *5 (N.D. Ga. Mar. 17, 2016).  The Court

finds that Plaintiff abandoned his claim against Sea Ray for breach of implied

warranty.  Bute v. Schuller Int'l, Inc., 998 F. Supp. 1473, 1477 (N.D. Ga. 1998)

("Because plaintiff has failed to respond to this argument or otherwise address this

claim, the Court deems it abandoned.").

---

corporate witness); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217–18
(S.D.N.Y. 2003) (interpreting the word "individual" in Rule 26(a)(1)(A)(i) as
inapplicable to corporate entities); Garrett v. Trans Union, LLC, 2006 WL
2850499, *7 (S.D. Ohio 2006) (the disclosure of corporate witnesses is not
required under Rule 26(a)(1)); Hooks v. Geico Gen. Ins. Co., No. 3:13-cv-891-J-
34JBT, 2016 U.S. Dist. LEXIS 133249, at *29-30 (M.D. Fla. Sep. 28, 2016)
(recognizing authority on both sides of the issue but finding any failure to disclose
witness providing corporate testimony about company policies and practices and
the meaning of internal documents was harmless).

Sea Ray's motion for summary judgment of no breach of implied warranty by Sea Ray is granted.

> e.    Counts V and VI:  Breach of Warranty Under the
>        Manguson-Moss Warranty Act

Both Defendants argue that Plaintiff's claims for breach of express and implied warranties under the MMWA fail because none of his warranty-based claims survive under state law.  ([40.1] at 22; [38.1] at 23).  The MMWA "does not provide an independent cause of action for state law claims, only additional damages for breaches of warranty under state law."  "The Act does not provide an independent cause of action for state law claims, only additional damages for breaches of warranty under state law."  McCabe v. Daimler AG, 948 F. Supp. 2d 1347, 1364 (N.D. Ga. 2013), citing Fedrick, 366 F. Supp. 2d at 1200 n.14; see also Dildine v. Town & Country Truck Sales, Inc., 577 S.E.2d 882, 884 (Ga. Ct. App. 2003) ("To recover, therefore, Dildine must show that Town & Country breached the implied warranty of merchantability arising under Georgia law.")).  "[W]here a plaintiffs state-law warranty claims are dismissed, then their claims under the [MMWA] must be dismissed as well because they are based upon the same allegations."  Helpling v. Rheem Mfg. Co., No. 1:15-CV-2247-WSD, 2016 WL 1222264, at *9 (N.D. Ga. Mar. 23, 2016).

Plaintiff does not have a viable claim for breach of express or implied warranty against MarineMax or Sea Ray under Georgia law. The Defendants' respective motions for summary judgment on Plaintiff's MMVA claims are therefore granted.

## III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Sea Ray Division of Brunswick Corporation's Motion for Summary Judgment [38] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Opinion Testimony of Robert Newman [39] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant MarineMax East, Inc.'s Motion for Summary Judgment [40] is **GRANTED IN PART and DENIED IN PART**. The motion is **DENIED** with respect to Count II (Revocation of Acceptance) and **GRANTED** with respect to all other Counts.

**IT IS FURTHER ORDERED** that Plaintiff Michael Wilson's Motion to Strike the Declaration of McLamb [53] is **DENIED AS MOOT**.

**SO ORDERED** this 26th day of March, 2018.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE